JLW: USAO#2022R00114

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. DLB24CR212 |
| | * | |
| v. | * | (Wire Fraud, 18 U.S.C. § 1343; |
| | * | Aggravated Identity Theft, 18 U.S.C. § |
| JEMEL MAURICE LYLES, JR. | * | 1028A; Money Laundering, 18 U.S.C. § |
| a/k/a "Mauricio Lyles," | * | 1957; Forfeiture, 18 U.S.C. § 982(a)(1), |
| | * | (C); 21 U.S.C. § 853(p); 28 U.S.C. |
| Defendant | * | § 2461(c)) |
| | * | |
| | * | **UNDER SEAL** |
| | * | |
| ***** | | |

USDC - GREENBELT
'24 JUN 27 PM 5:31

### INDICTMENT

### COUNTS ONE THROUGH THREE
(Wire Fraud)

The Grand Jury for the District of Maryland charges:

**Introduction: Relevant Persons, Entities, and Accounts**

At all times material to this Indictment:

1. Defendant **JEMEL MAURICE LYLES, JR. a/k/a "Mauricio Lyles"** ("**LYLES**") was a resident of the District of Columbia and Maryland.

2. **LYLES** was the controlling owner of Green Capital Construction and Landscape, LLC ("Green Capital") – a construction and landscaping business. On or about January 30, 2020, **LYLES** filed Articles of Organization with the state of Maryland for Green Capital. On or about March 26, 2020, Green Capital was "Voided for Non-Payment" by the state of Maryland. On or about April 9, 2020, **LYLES** resubmitted Articles of Organization to the state of Maryland for Green Capital.

3. On or about March 2, 2020, **LYLES** opened two bank accounts in the name of

1

Green Capital at a Maryland branch of TD Bank, with account numbers ending in 4402 (the "4402 Account") and 4387 (the "4387 Account"). **LYLES** was the sole signatory on the 4402 Account and the 4387 Account.

4. Individual-1 was a resident of the District of Columbia and Maryland. Individual-1 and **LYLES** had an on and off romantic relationship from approximately 2010 to 2021.

5. Individual-2 was a resident of Pennsylvania and the owner of a tax preparation and bookkeeping business. **LYLES** retained Individual-2 to provide bookkeeping services and assist in preparing Paycheck Protection Program loan applications for Green Capital.

6. Individual-3 was a resident of Maryland and a friend of **LYLES** since approximately 2002.

7. TD Bank was a federally insured financial institution headquartered in Cherry Hill, New Jersey. TD Bank participated as a lender in the Paycheck Protection Program ("PPP") administered by the United States Small Business Administration ("SBA").

8. Kabbage, Inc. ("Kabbage") was an online financial technology company for small businesses headquartered in Atlanta, Georgia. Kabbage participated as a lender in the PPP administered by the SBA. The servers that Kabbage used to process PPP loans were located in Virginia.

### The Paycheck Protection Program

9. The PPP was a COVID-19 pandemic relief program administered by the SBA that provided forgivable loans to small businesses for job retention and certain other expenses. The PPP permitted participating third-party lenders to approve and disburse SBA-backed PPP loans to cover payroll, fixed debts, utilities, rent/mortgage, accounts payable and other bills incurred by qualifying businesses, during and resulting from, the COVID-19 pandemic. PPP loans were

fully guaranteed by the SBA.

10. To obtain a PPP loan, a qualifying business was required to submit a PPP loan application, which was supposed to be signed by an authorized representative of the business. The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications to be eligible to obtain the PPP loan. In the PPP loan application, the business (through its authorized representative) was required to state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees. These figures were used to calculate the amount of money the small business was eligible to receive under the PPP.

11. If an owner of 20% or more of the equity of a qualifying business applying for a loan had, in the last five years, been convicted for any felony involving fraud, they would have been ineligible to receive a PPP loan.

12. A PPP loan application was required to be processed by a participating lender, such as a financial institution. If a PPP loan application was approved, the participating lender funded the PPP loan using its own monies, which were 100% guaranteed by the SBA.

13. PPP loan proceeds were required to be used by the business on certain permissible expenses—payroll costs, interest on mortgages, rent, and utilities. The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the business spent the loan proceeds on these expense items within a designated period and used a certain percentage of the PPP loan proceeds on payroll expenses.

14. When submitting their PPP application, applicants certified that the information provided in the application and supporting documents was correct subject to criminal and civil penalties and that they would use the proceeds pursuant to applicable PPP rules and regulations.

15. The PPP was later extended to include a second round of funding for certain

businesses that received a first PPP loan. These were referred to as "Second Draw PPP Loans."

16. To obtain a Second Draw PPP loan, a small business submitted a PPP Second Draw loan application, which was signed by an authorized representative of the business, to an authorized lender. The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and to make certain certifications to be eligible for the PPP loan.

17. The authorized representative of the small business provided information as to the purpose of the loan, average monthly payroll, number of employees and background of the business and its owner. The average monthly payroll expenses and the number of employees were used to calculate the amount of money the small business was eligible to receive under the PPP. In addition, businesses applying for a PPP Second Draw loan were required to provide documentation confirming their payroll expenses. If an owner of 20% or more in the equity of the business had been convicted for a crime involving fraud in the prior five years, the business would have been ineligible to receive the Second Draw PPP loan.

18. Like First Draw PPPs, Second Draw PPP loan application was processed by a participating lender. If a PPP loan application was approved, the lender funded the PPP Second Draw loan using its own monies through a deposit to a bank account of the borrower. While it was the participating lender that issued the PPP Second Draw loan, the loan was 100% guaranteed by the SBA.

19. Second Draw PPP loan proceeds were required to be used by the business on certain permissible expenses—payroll costs, rent for the business premises, or interest on mortgages on the business premises, utilities for the business, and worker protection costs related to COVID-19. The PPP Second Draw loan program allowed the interest and principal on the PPP loan to be forgiven if the business spent the loan proceeds on these expense items within a

designated period and used a defined portion of the PPP loan proceeds on payroll expenses.

20. As with First Draw PPPs, applicants needed to certify that the information provided in their Second Draw PPP application and supporting documents was correct subject to criminal and civil penalties and that they would use the proceeds pursuant to applicable PPP rules and regulations.

## The Scheme to Defraud

21. Beginning in or about April 2020 and continuing until in or about February 2021, in the District of Maryland and elsewhere, the defendant,

**JEMEL MAURICE LYLES,**

did knowingly and willfully devise a scheme and artifice to defraud the SBA, a financial institution, to wit: TD Bank, and a PPP lender, to wit: Kabbage, to obtain money by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing and attempting to execute the scheme to defraud, did knowingly and willfully transmit and cause to be transmitted by means of wire communications, in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, in violation of 18 U.S.C. § 1343 ("the scheme to defraud").

## The Object of the Scheme to Defraud

22. It was the object of the scheme to defraud for **LYLES** to personally enrich himself by fraudulently obtaining PPP loans and spending the funds for purposes not permitted under the PPP loan program.

5

## Manner and Means of the Scheme to Defraud

It was part of the scheme to defraud that:

PPP Loan for Green Capital

23. On or about April 11, 2020, **LYLES** submitted and caused to be submitted a false and misleading PPP loan application to TD Bank in the name of Green Capital, seeking approximately $105,381 in PPP funds.

24. In the application, **LYLES** made and caused to be made false statements, misrepresentations, and omissions related to Green Capital including Green Capital's average monthly payroll, the ownership structure of Green Capital, and the intended use of the PPP loan proceeds.

25. In the application, **LYLES**, through Individual-1, falsely listed Individual-1 as the 80-percent owner of Green Capital and did not list himself as an owner of Green Capital. In fact, Individual-1 was not an 80-percent owner of Green Capital, and PPP rules and regulations required **LYLES's** ownership of Green Capital to be disclosed on Green Capital's application.

26. In connection with the application, **LYLES** submitted and caused to be submitted a fictitious operating agreement, which falsely indicated that Individual-1 was an 80-percent owner of Green Capital.

27. **LYLES** directed Individual-1 to sign and initial the required attestations on the PPP application for Green Capital.

28. In the application, **LYLES,** through Individual-1, falsely promised to spend PPP funds only on allowable expenses such as payroll, business rent, and business utilities.

6

29. In the application, **LYLES**, through Individual-1, attested that the information presented in the application and all supporting documents and forms to obtain the loans were true and accurate.

30. In the application, **LYLES**, through Individual-1, falsely represented that the "any individual owning 20% or more of equity of" Green Capital had not been convicted of a felony within the past 5 years when **LYLES** then and there knew that was not true with respect to **LYLES**, the controlling owner of Green Capital.

31. In the final version of the application, **LYLES** falsely stated that Green Capital had an average monthly payroll of $42,153.

32. On or about April 10, 2020, **LYLES** sent his bookkeeper, Individual-2, an email that falsely stated amounts allegedly paid to specific alleged Green Capital employees between January and February 2020.

33. On or about April 10, 2020, **LYLES** called Individual-2 to discuss the amounts he purportedly paid specific individuals as Green Capital employees between January and February 2020.

34. On or about April 10, 2020, by making this phone call to Individual-2 using a cell tower in Maryland, **LYLES** caused an interstate wire communication from Maryland to a location outside Maryland.

35. In connection with the PPP application, **LYLES** submitted and caused the submission of a false payroll document, which misrepresented the amount of money that Green Capital allegedly paid specific individuals as Green Capital employees. Individual-2 created this document using the information **LYLES** provided in his April 10, 2020 email and call.

36. In the PPP loan application, **LYLES** provided a bank account number into which PPP loan proceeds were deposited, namely the 4402 Account.

37. On or about May 6, 2020, **LYLES** caused TD Bank to distribute approximately $105,382 in PPP funds through an ACH transfer sent to the 4402 Account. Immediately prior to the transfer, the 4402 Account held less than $20.

38. On or about May 6, 2020, immediately following the deposit of the PPP funds, **LYLES** caused $101,000 to be transferred from the 4402 Account to the 4387 Account. The day before the transfer, the 4387 Account had a balance of approximately $188.

39. Beginning on or about May 6, 2020, and continuing until on or about August 5, 2020, **LYLES** caused PPP loan proceeds to be transferred and used for personal and unauthorized expenses not permissible under the PPP.

First Draw PPP Loan in the Name of Individual-3

40. On or about August 6, 2020, **LYLES** submitted and caused to be submitted false and misleading information and supporting documents to Kabbage in connection with a PPP loan application in the name of Individual-3.

41. In connection with the application, on or about August 6, 2020, **LYLES** submitted and caused to be submitted Individual-3's Maryland driver's license as proof of identification.

42. In connection with the application, on or about August 6, 2020, **LYLES** submitted and caused to be submitted a falsified 2019 Form 1099-MISC showing that Individual-3 made $50,000 renting property. In fact, that 2019 Form 1099-MISC was never filed with the IRS and Individual-3 did not make $50,000 renting property.

43. In connection with the application, on or about August 6, 2020, **LYLES** submitted and caused to be submitted a falsified 2019 Schedule C Form 1040 showing that Individual-3 made a profit of $212,550 as a realtor. In fact, that 2019 Schedule C Form 1040 was never filed with the IRS, and Individual-3 did not make $212,550 profit as a realtor.

8

44. In these false and misleading supporting documents, **LYLES** falsely listed Individual-3 as the applicant and listed Individual-3's Social Security Number as the relevant taxpayer identification number.

45. In the PPP loan application, **LYLES** provided a bank account number into which PPP loan proceeds were deposited, namely the 4387 Account.

46. On or about August 6, 2020, **LYLES** used the Internet Protocol address associated with a location in Montgomery County, Maryland when submitting false and misleading information and supporting documents to Kabbage in connection with the PPP loan application in the name of Individual-3.

47. On or about August 6, 2020, **LYLES** caused interstate wire communications from Maryland to Virginia, the location of Kabbage's server, when submitting false and misleading information and supporting documents to Kabbage in connection with the PPP loan application in the name of Individual-3.

48. On or about August 10, 2020, **LYLES** submitted and caused to be submitted a false and misleading PPP application to Kabbage in the name of Individual-3.

49. In the PPP application, **LYLES** made and caused to be made false statements, misrepresentations, and omissions related to Individual-3, including that this application was submitted by Individual-3, that Individial-3 had an average monthly payroll of $8,334, and the intended use of the PPP loan proceeds.

50. In the application, **LYLES** falsely listed Individual-3 as the applicant and listed Individual-3's Social Security Number as the relevant taxpayer identification number.

51. On or about August 12, 2020, **LYLES** caused Kabbage to distribute approximately $20,833 through an ACH transfer sent to the 4387 Account.

52. Beginning on or about August 12, 2020 and continuing until in or about December 31, 2020, **LYLES** caused PPP loan proceeds to be transferred and used for personal and unauthorized expenses not permissible under the PPP.

Second Draw PPP Loan in the Name of Individual-3

53. On or about February 4, 2021, **LYLES** electronically signed and caused to be electronically signed a false and misleading second PPP loan application to Kabbage in the name of Individual-3.

54. In the application, **LYLES** made and caused to be made false statements, misrepresentations, and omissions related to Individual-3, including that this application was submitted and signed by Individual-3, that Individial-3 had an average monthly payroll of $8,334, and the intended use of the PPP loan proceeds.

55. In the application, **LYLES** falsely listed Individual-3 as the applicant and listed Individual-3's Social Security Number as the relevant taxpayer identification number.

56. On or about February 4, 2021, **LYLES** used the Internet Protocol address associated with a location in Montgomery County, Maryland when applying for the PPP loan in the name of Individual-3.

57. On or about February 4, 2021, **LYLES** caused interstate wire communications from Maryland to Virginia, the location of Kabbage's server, when electronically signing and causing to be electronically signed the PPP loan in the name of Individual-3.

58. On or about February 11, 2021, as a result of the false and misleading second PPP loan application to Kabbage in the name of Individual-3, **LYLES** caused Kabbage to distribute approximately $20,833 through an ACH transfer sent to the 4387 Account.

59. . Beginning on or about February 11, 2021 and continuing until in or about May 31, 2021, **LYLES** caused PPP loan proceeds to be transferred and used for personal and

unauthorized expenses not permissible under the PPP. The 4387 Account was closed on June 1, 2021 with a negative balance.

## THE CHARGES

60. On or about the dates set forth below, in the District of Maryland and elsewhere, the defendant,

**JEMEL MAURICE LYLES,**

for the purpose of executing and attempting to execute the scheme and artifice to defraud described above, did knowingly transmit and cause to be transmitted in interstate commerce by means of wire communication, certain signals, signs, and sounds, as set forth below:

| COUNT | APPROXIMATE DATE | DESCRIPTION | INTERSTATE WIRE COMMUNICATION DETAILS |
|---|---|---|---|
| 1 | April 10, 2020 | Phone call from **LYLES** to Individual-2 | From Maryland to a location outside of Maryland |
| 2 | August 6, 2020 | Submission of First Draw PPP application supporting documents in the name of Individual-3 | From Maryland to a location outside of Maryland |
| 3 | February 4, 2021 | Electronic signing of Second Draw PPP loan application in the name of Individual-3 | From Maryland to a location outside of Maryland |

18 U.S.C. § 1343

11

## COUNTS FOUR AND FIVE
### (Aggravated Identity Theft)

The Grand Jury for the District of Maryland further charges:

1. Paragraphs 1 through 20 of Counts One through Three are realleged here.

2. On or about the dates listed below, in the District of Maryland and elsewhere, the defendant,

### JEMEL MAURICE LYLES

did knowingly possess and use, without lawful authority, a means of identification of another real person, namely Individual-3, by submitting the name and Social Security Number for Individual-3, during and in relation to Wire Fraud, in violation of 18 U.S.C. § 1343, as alleged in the Counts of the Indictment listed below:

| COUNT | APPROXIMATE DATE | DESCRIPTION | Wire Fraud Count |
|---|---|---|---|
| 4 | August 6, 2020 | Submitting supporting documents for First Draw PPP loan using the name and Social Security Number of Individual-3 | 2 |
| 5 | February 4, 2021 | Signing Second Draw PPP loan application using the name of Individual-3 | 3 |

18 U.S.C. § 1028A
18 U.S.C. § 2

12

## COUNT SIX
## (Money Laundering)

The Grand Jury for the District of Maryland further charges:

1. Paragraphs 1 through 20 of Counts One through Three are realleged here.

## THE CHARGE

2. On or about May 6, 2020, in the District of Maryland and elsewhere, the defendant,

## JEMEL MAURICE LYLES,

did knowingly engage and attempt to engage in a monetary transaction by, through, and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, that is, the transfer of funds from the 4402 Account to the 4387 Account, such property being derived from a specified unlawful activity, that is, wire fraud, in violation of 18 U.S.C. § 1343.


18 U.S.C. § 1957
18 U.S.C. § 2

13

## FORFEITURE ALLEGATION

The Grand Jury for the District of Maryland further finds that:

1. Pursuant to Fed. R. Crim. P. 32.2, notice is hereby given to the defendant that, in the event of the defendant's conviction on any of the offenses alleged in Counts One through Three or Six of this Indictment, the United States will seek forfeiture as a part of any sentence in accordance with 18 U.S.C. §§ 981(a)(1)(C) and 982, 21 U.S.C. § 853(p), and 28 U.S.C. § 2461(c).

### Wire Fraud Forfeiture

2. Upon conviction of any of the offenses alleged in Counts One, Two, and Three of this Indictment, the defendant,

**JEMEL MAURICE LYLES,**

shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the scheme to defraud.

### Money Laundering Forfeiture

3. Upon conviction of the offense alleged in Count Six of this Indictment, the defendant,

**JEMEL MAURICE LYLES,**

shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(1), any property, real or personal, involved in such offense, or any property traceable to such property.

### Substitute Assets

4. If, as a result of any act or omission of the defendant, any of the property described above as being subject to forfeiture:

    a. cannot be located upon the exercise of due diligence;

14

      b.      has been transferred or sold to, or deposited with, a third person;

      c.      has been placed beyond the jurisdiction of the Court;

      d.      has been substantially diminished in value; or

      e.      has been commingled with other property that cannot be divided without difficulty;

the United States shall be entitled to forfeiture of substitute property up to the value of the forfeitable property described above pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b)(1) and 28 U.S.C. § 2461(c).

18 U.S.C. § 981(a)(1)(C)
18 U.S.C. § 982
21 U.S.C. § 853(p)
28 U.S.C. § 2461(c)

_Erek L. Barron_
Erek L. Barron
United States Attorney

A TRUE BILL:

SIGNATURE REDACTED

Foreperson

Date: 6-27-, 2024

15